PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 18-3011
_____


MARILYN ADAMS,
             Appellant

v.

ZIMMER US, INC.; ZIMMER HOLDINGS, INC.;
ZIMMER, INC.; ZIMMER SURGICAL, INC.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civ. Action No. 5-17-cv-00621
District Judge: Honorable Edward G. Smith

_____

ARGUED: April 17, 2019

Before:  AMBRO, GREENAWAY, JR., and SCIRICA,
*Circuit Judges*.

(Filed:  November 20, 2019)

Charles L. Becker    [ARGUED]
Ruxandra M. Laidacker
Kline & Specter
1525 Locust Street
19th Floor
Philadelphia, PA 19102

Joseph A. Osborne, Jr.
Andrew Norden
Ami Romanelli
Osborne & Francis
433 Plaza Real Boulevard
Suite 271
Boca Raton, FL 33432

*Counsel for Appellant*

Dana E. Becker
Troy S. Brown
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103

Bruce G. Jones        [ARGUED]
Faegre Baker Daniels
90 South 7th Street
2200 Wells Fargo Center
Minneapolis, MN 55402

Michael J. Kanute
Faegre Baker Daniels

311 South Wacker Drive
Suite 4400
Chicago, IL 60606

*Counsel for Appellees*

_____

OPINION OF THE COURT

_____

**SCIRICA**, *Circuit Judge*

Pennsylvania's discovery rule delays the start of the statute-of-limitations period until a plaintiff knows or reasonably should know she has suffered an injury caused by another. This appeal requires us to decide whether a reasonable juror could credit plaintiff Marilyn Adams's contention that she reasonably did not know until February 12, 2015 that the hip implant made by defendant Zimmer, Inc., caused her the injuries for which she now sues. When Adams brought a defective design claim against Zimmer in February 2017, Zimmer contended she should have discovered her injury by January 2015, when she agreed to undergo hip implant revision surgery. The District Court accepted Zimmer's argument and granted summary judgment on the ground that Adams's claim was untimely under the discovery rule and two-year statute of limitations. In doing so, however, the District Court resolved issues of fact regarding the timing of Adams's discovery that her hip pain was caused not by her poor adjustment to the implant but instead by the implant itself. Because Pennsylvania law delegates to a factfinder any genuine dispute over when a

3

plaintiff in Adams's position should reasonably have discovered her injury, we will reverse and remand.

**I.**

Plaintiff-Appellant Marilyn Adams had a long and difficult history with hip pain.[1] Adams first sought medical help from orthopedic surgeon Dr. Prodromos Ververeli in September 2010; he diagnosed her with advanced degenerative arthritis and recommended a total hip replacement. Dr. Ververeli counseled Adams that the hip replacement would last fifteen to twenty years, though he warned her the implant may wear down with use before then. Adams agreed to a hip replacement and Dr. Ververeli performed the procedure on January 18, 2011, implanting a Zimmer hip device.[2]

Adams had no further problems with her hip for roughly a year and a half, but in late 2012, she started experiencing severe pain. Dr. Ververeli described the cause of her problems as "unclear" and the diagnostic process as "difficult." App'x 958, 228. He ran various tests attempting to identify the pain's source, eventually diagnosing Adams with an infection. Although he warned Adams that a severe infection may require

---

[1] Because we review a grant of summary judgment against Adams, we view all facts in the light most favorable to her and draw reasonable inferences in her favor. *See Debiec v. Cabot Corp.*, 352 F.3d 117, 128 n.3 (3d Cir. 2003).

[2] The implant is composed of several pieces, collectively referred to as the "Zimmer implant": a femoral head; a "neck" that connects the femoral head to the stem; a stem that connects the neck to the femur; and a socket that facilitates implantation.

4

removing part of her hip replacement, he was able to successfully treat it in 2013 without removing the implant.

Adams's hip problems returned in November 2014, when she dislocated her hip while spending several months in Florida. Doctors in the emergency room there put the implant back in place, and Adams saw Dr. Ververeli when she returned home in early January 2015. Dr. Ververeli ordered various diagnostic tests, and an x-ray showed calcification around the implant. Dr. Ververeli testified he thought this abnormal result "could have been possibl[y] related to ongoing tissue reaction or a reaction to the actual dislocation event." App'x 232. He ordered a CT scan, which showed a local adverse tissue reaction.

Dr. Ververeli recommended hip revision surgery for Adams to replace the metal femoral head of her hip implant with a ceramic one. Though Adams was distraught to undergo hip surgery again, she consented to the operation. She went in for a pre-operative visit on January 30, 2015. Records from the visit indicate Adams was suffering from "right total hip metallosis," App'x 166, which Dr. Ververeli testified is defined, "typically," as "metal wear that then causes a reaction to the surrounding tissues"; he added the precise reaction varies depending on the individual patient. App'x 218. Adams testified she did not recall hearing about metallosis, but remembered being distraught over her upcoming surgery. She went into Dr. Ververeli's office on February 9 to sign an informed consent form, which generally repeated the information she had been told in her pre-operative visit.

Adams underwent the revision surgery on February 12, 2015. Though Dr. Ververeli expected to replace only

5

components of the implant around the hip socket, what he discovered during the surgery called for a different—and much more drastic—revision: upon opening Adams's hip, Dr. Ververeli found her muscle had largely deteriorated and metal debris had taken over much of the area. He discovered a pseudotumor roughly the size of a baseball. Rather than replacing the socket and implant lining, which were in fact largely "intact," App'x 235, he replaced all of the main components of the implant hip, which had been discharging excessive and potentially toxic metal debris into Adams's hip. Dr. Ververeli told Adams about his intraoperative findings after her surgery.

Adams continued to experience hip pain after the surgery, and on February 10, 2017, she brought a product liability action against Zimmer.[3] She alleged the implant was defectively designed in a way that led to "excessive fretting" (*i.e.*, scraping between the pieces of the implant), corrosion, and metal wear debris; she further alleged Zimmer had failed to warn her of those risks. Zimmer moved for summary judgment on the ground that Adams's claims were time-barred. The District Court agreed and entered summary judgment on statute-of-limitations grounds. Adams appeals.[4]

---

[3] Adams sued Zimmer US, Inc., Zimmer Holdings, Inc., Zimmer, Inc., and Zimmer Surgical, Inc. We refer to all the defendants collectively as "Zimmer."

[4] The District Court had diversity jurisdiction under 28 U.S.C. § 1332 and we have jurisdiction over Adams's timely appeal under 28 U.S.C. § 1291. Like the District Court, we apply Pennsylvania law in this diversity jurisdiction case. *See Debiec*, 352 F.3d at 128. "We exercise plenary review over a district court's grant of summary judgment and apply the same

**II.**

A.

In Pennsylvania, a prospective plaintiff has two years to bring a design defect claim like Adams's. *See* 42 Pa. Cons. Stat. § 5524(2). The two-year statute of limitations generally begins to run "when an injury is inflicted." *Wilson v. El-Daief*, 964 A.2d 354, 361 (Pa. 2009). But "where the plaintiff's injury or its cause was neither known nor reasonably ascertainable," the "discovery rule" tolls the statute of limitations. *Nicolaou v. Martin*, 195 A.3d 880, 892 (Pa. 2018); *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005). The discovery rule accordingly protects parties who are reasonably unaware of latent injuries or suffer from injuries of unknown etiology. *Nicolaou*, 195 A.3d at 892 & n.13; *Fine*, 870 A.2d at 858.

Under the Pennsylvania discovery rule, the "commencement of the limitations period is grounded on 'inquiry notice' that is tied to 'actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice to the full extent of the injury, the fact of actual negligence, or precise cause.'" *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011) (quoting *Wilson*, 964 A.2d at 364). The statute of limitations accordingly begins to run when the plaintiff knew or, exercising reasonable diligence, should have known (1) he or she was injured and (2) that the injury was caused by another. *See Coleman v. Wyeth Pharms.*, 6 A.3d 502,

standard as the district court; i.e., whether there are any genuine issues of material fact such that a reasonable jury could return a verdict for the plaintiffs." *Id.* at 128 n.3.

7

510–11 (Pa. Super. Ct. 2010). That "reasonable diligence" standard is an objective one, but at the same time "sufficiently flexible" to "take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." *Fine*, 870 A.2d at 858 (internal citation omitted); *see also Nicolaou*, 195 A.3d at 893. Plaintiffs generally will not be charged with more medical knowledge than their doctors or health care providers have communicated to them. *See Wilson*, 964 A.2d at 365. A plaintiff bears the burden of showing her reasonable diligence. *Nicolaou*, 195 A.3d at 893.

"The balance struck in Pennsylvania" between the rights of diligent plaintiffs and defendants who should not have to face stale claims "has been to impose a . . . limited notice requirement upon the plaintiff, but to submit factual questions regarding that notice to the jury as fact-finder." *Gleason*, 15 A.3d at 485. "[T]hat the factual issues pertaining to Plaintiffs' notice and diligence are for a jury to decide" is a "well-established general rule" in Pennsylvania. *Nicolaou*, 195 A.3d at 894; *see also Carlino v. Ethicon, Inc.*, 208 A.3d 92, 104 (Pa. Super. Ct. 2019). "The interplay between summary judgment principles and application of the discovery rule requires us to consider whether it is undeniably clear that [Adams] did not use reasonable diligence in timely ascertaining [her] injury and its cause, or whether an issue of genuine fact exists regarding [her] use of reasonable diligence to ascertain [her] injury and its cause." *Gleason*, 15 A.3d at 486–87. If such an issue of diligence or notice exists, it is a jury's role to resolve it. "Where, however, reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, . . . the discovery rule does not apply as a matter of law." *Fine*, 870

A.2d 858–59.

B.

The central issue in this case is whether a jury could conclude Adams reasonably did not discover her injury until February 12, 2015, when Dr. Ververeli apprised her of his intraoperative finding that her implant had deteriorated and emitted metal shards into her hip. The District Court concluded there can be no dispute that the information available to Adams in her preoperative visits would have put a reasonably diligent person on notice of her injury as a matter of law. In reviewing that determination at summary judgment we must "view the record and draw inferences in a light most favorable to" Adams as "the non-moving party." *Debiec v. Cabot Corp.*, 352 F.3d 117, 128 n.3 (3d Cir. 2003). Doing so, we cannot conclude that summary judgment was appropriate. As in the several Pennsylvania Supreme Court cases before this one, the question "[w]hether [a plaintiff] should have acted with greater diligence to investigate" or otherwise should have known of her injury earlier "can only be seen as an issue of fact." *Gleason*, 15 A.3d at 487.

The Pennsylvania Supreme Court has paid particular heed to the jury's role in determining reasonable diligence in medical contexts. The cause of a patient's pain or discomfort can be difficult for her to identify, so courts rarely impute knowledge as a matter of law. The Court explained that principle in *Fine v. Checcio*, 870 A.2d 850 (Pa. 2005), its seminal treatment of the discovery rule in the context of etiological uncertainty. There, Fine had experienced facial numbness after having his wisdom teeth extracted. His doctor advised him the numbness was a normal side-effect of the

9

surgery, but the numbness persisted for nearly a year. When Fine filed a malpractice claim about two years and one month after his wisdom tooth surgery, his doctor successfully obtained a summary judgment; the doctor defendant argued the limitations period began on the date of the extraction because Fine knew his injury—numbness—then. But the Pennsylvania Supreme Court disagreed. It held that a reasonable jury could understand Fine's numbness as "indicative of two distinct phenomena"—temporary side effect or permanent injury. *Id.* at 861. Because of that factual uncertainty, a jury might determine a reasonable person in his position neither knew nor should have known of his injury immediately after surgery.

The Court has continued to emphasize the principle that diagnostic uncertainty usually creates a jury question. In *Wilson v. El-Daief*, 964 A.2d 354 (Pa. 2009), for instance, the Court held the plaintiff's immediate suspicion of surgical error after surgery did not start the statutory clock as a matter of law because her surgeon denied error and the second opinion she sought suggested surgical error as only one of several possible explanations for her pain. *Id.* at 365–66. *See also Gleason*, 15 A.3d at 486–87 (similar). Most recently, in *Nicolaou v. Martin*, 195 A.3d 880 (Pa. 2018), the Court affirmed that principle: Nicolaou was bitten by a tick in 2001 and immediately sought a Lyme disease test; though her symptoms persisted, that test, and three others administered over the next half dozen years, all came back negative. She eventually saw a fifth healthcare provider in 2009, who diagnosed her with probable Lyme disease and recommended an advanced test. Nicolaou initially declined to pay for the test for financial reasons, but ultimately took it in February 2010. That test confirmed she had Lyme disease. The Court held that Nicolaou—who brought suit about two years after the February 2010 test—should be able to

present her case for reasonable diligence to a jury. *Id.* at 894–95.

Like the plaintiffs in these Pennsylvania Supreme Court cases, Adams has maintained that she acted with reasonable diligence yet did not discover her injury until February 2015. Adams's claim here is that she did not know the nature of her injury or that it was the deterioration of the Zimmer implant, rather than her reaction to the implant, that was the cause. Just as a jury could find the plaintiff in *Fine* ascribed his pain to temporary post-operative numbness, so a jury could reasonably conclude Adams ascribed her pain to her own poor adjustment to the implant; it was only when her doctor discovered new information "intraoperatively" that she would know the implant's disintegration, rather than her reaction to the implant, was causing her pain. App'x 238.

To be sure, Pennsylvania's discovery rule asks only when Adams knew she was injured and that her injury was caused by another. For the statute of limitations to start, she "need not know that [the] defendant's conduct is injurious." *Wilson*, 964 A.2d at 363. But that limitation on the requirements for notice was developed in order to hold plaintiffs to a standard of reasonable diligence: it operates to bar a claim where "the plaintiff has failed to exercise diligence in determining injury and cause by another, but has limited relevance in scenarios in which the plaintiff has exercised diligence but remains unaware of either of these factors." *Id.* Zimmer does not dispute that Adams investigated her claim in coordination with Dr. Ververeli, *see* Oral Arg. Recording at 26:03–26:48, and a factfinder could reasonably determine that Adams had exercised reasonable diligence. This strongly counsels against determining notice as a matter of law.

11

Pennsylvania Supreme Court precedent further illustrates that while the discovery rule does not require the patient to have "a precise medical diagnosis" to start the statute of limitations, "a lay person is only charged with the knowledge communicated to him or her by the medical professionals who provided treatment and diagnosis." *Nicolaou*, 195 A.3d at 893; *see also Wilson*, 964 A.2d at 365. Adams has offered evidence that Dr. Ververeli himself did not know her injury and its cause until he was in the middle of operating on her hip in February 2015. Dr. Ververeli testified that his understanding of the injury and its cause fundamentally changed "intraoperatively," App'x 238: he began the operation planning to repair and replace the socket of the implant, which he expected had worn down with Adams's use, but the socket was in fine shape. He instead discovered the implant hip itself was corroding into Adams's hip and causing her harm. Before that revision surgery, Dr. Ververeli expected Adams was adjusting poorly because "the longevity of the plastic [was] wearing out" around the plastic-lined socket; as to the implant and surrounding hip, he expected "normal appearance." App'x 235. But once he began operating, Dr. Ververeli realized Adams's hip looked unlike the "many hip revisions [he had done] in [his] career." App'x 235. He testified: "[W]hen I opened up Marilyn's hip what became very abundant in this reaction, it almost looked like debris where her muscle should be as kind of replaced with this very friable, very fragile membrane that had a vascularity to it." App'x 235. Having seen the interior of Adams's hip, he formed the opinion that her "adverse local tissue reaction [was] secondary," *i.e.*, not caused by her body's poor adjustment, but instead "a reaction to the [Zimmer implant]." App'x 238. He agreed that the corrosion and fretting that make up her injury were not, and could not, be

12

"detect[ed] until the time of the revision when the implant [was] visible." App'x 241.

A reasonable jury could accept Dr. Ververeli's conception of the injury and cause changed during the revision surgery. And if Dr. Ververeli did not realize a problem with the implant was injuring Adams until the revision surgery, under Pennsylvania law Adams too cannot be charged with that constructive knowledge. Reasonable jurors could accordingly find Adams, though she knew she had trouble adjusting to her implant, could reasonably not have known that the implant itself was the cause of her injury.

In response, Zimmer points to various facts to contend Adams had constructive or actual knowledge of her injury. Though these facts are all relevant to a jury's determination of knowledge and reasonable diligence, none of them support imputing knowledge as a matter of law.

First, Zimmer asserts Adams's awareness that the revision surgery would replace the Zimmer femoral head with another brand of implant put her on actual or constructive notice that the implant caused her injury. As Zimmer points out, Adams testified that she would have objected had her doctor proposed to replace the femoral head with another Zimmer product. *See* App'x 167 (Adams Deposition) ("It just seemed that something was wrong. It had to come out.").[5] But

---

[5] The Dissent finds this statement necessarily represents actual knowledge of injury and cause on Adams's part. For the reasons discussed below, Adams's recognition that she had a problem adjusting to her implant does not necessarily mean she knew the Zimmer device, rather than her own reaction to it,

*Nicolaou* illustrates how a plaintiff's after-the-fact recollection of general suspicions does not start the statutory clock as a matter of law. There, the Pennsylvania Supreme Court reversed the lower court's grant of summary judgment on Nicolaou's February 2012 medical negligence claim, reasoning that even though a medical professional diagnosed her with probable Lyme disease in July 2009, a reasonable jury may believe she should not be charged with discovering her injury until February 2010, when she formally received positive Lyme disease test results. 195 A.3d at 884–85, 894. The Court reached this conclusion despite recognizing a Facebook post in which Nicolaou, after receiving her 2010 diagnosis, stated she had told everyone she had Lyme disease "for years" and her previous doctors "ignored" her. *Id.* at 885, 887. Similarly, in *Wilson* the plaintiff's after-the-fact testimony that she knew at an earlier point "something is wrong here[, s]omething is really wrong" did not start the statutory clock as a matter of law. 964 A.2d at 358. The Court reasoned: "Recognizing that the testimony provides substantial support for Appellees' position in the fact-finding inquiry, we conclude that it does not unambiguously establish notice of injury and cause, particularly in light of other portions of the testimony." *Id.* at 366.

Here, too, Adams has pointed to other parts of her testimony and the record that a reasonable juror could credit. Adams emphasizes that, like the plaintiffs in *Nicolaou* and *Wilson*, she had a "difficult" diagnostic history that counsels

---

was the cause of her pain. We need not determine which is the better understanding of her statement because the only question for our review is whether reasonable minds could understand it, and the rest of the facts, differently. As the two opinions in this case illustrate, they could.

14

against quickly charging her with knowledge of an injury. App'x 228. She moreover had confronted the possibility of her implant being replaced once before, during her 2012–13 struggle with infection; the implant was ultimately left in place, which could lead a reasonable person in her position to believe surgery calling for removal did not mean the device itself was causing her harm. Adams also asserts, and Dr. Ververeli confirms, that she was extremely distraught in the time leading up to the revision surgery, and a jury could understand her aversion to a Zimmer replacement in this light: she was in pain, so she wanted the device "to come out" without linking her pain to a problem with the device. App'x 167. And ultimately, a jury could reasonably credit her assertion that she then believed she had a bad reaction to the device without yet understanding she had an injury "caused by another party's conduct." *Nicolaou*, 195 A.3d at 892.

Second, Zimmer contends that Dr. Ververeli, his staff, and various pre-surgery paperwork actually notified Adams on January 30, 2015 and February 9, 2015 that she was suffering from "metallosis" and an "adverse tissue reaction" in advance of the operation. Under Pennsylvania law, however, knowledge of medical terminology like "metallosis" and "adverse tissue reaction" is not sufficient to impute constructive knowledge. *See Coleman*, 6 A.3d at 518 ("[A] reasonable person [could] conclude that Ms. Coleman was confused and uncertain about the significance of the fact that her cancer was 'estrogen positive.' . . . A jury could reasonably find that Dr. Webb's comment that Ms. Coleman's breast cancer was 'estrogen receptor positive' did not constitute notice to her that the etiology of her cancer was the HRT medications."). At any rate, Dr. Ververeli's testimony that he did not know Adams had an injury caused by the implant until

15

the revision surgery shows his "metallosis" diagnosis could not have communicated the pertinent understanding of injury or cause to Adams.[6]

While a jury may ultimately credit Zimmer's contention that Adams knew or should have known about her injury at some point before the February 2015 revision surgery, Adams has raised factual issues of notice and knowledge that Pennsylvania law requires a jury to resolve.

## III.

Because factual disputes remain concerning application of the discovery rule, we will reverse and remand for further proceedings.

---

[6] Zimmer also asserts that Adams's signed surgical consent form from February 9, 2015 is independent evidence that she had actual notice of injury by that date. But because the consent form simply repeats the information Adams heard on her January 30 preoperative visit, that argument rises and falls with Zimmer's other factual challenges. Like the rest of the facts it points to, the February 9 consent form can be presented as evidence to a jury but does not, as a matter of law, establish actual notice.

GREENAWAY, JR., *Circuit Judge*, dissenting.

Pain is an overwhelming force in the human experience. When one is in pain, the predominant thoughts are: "How and when will this pain go away? Just get rid of the pain!" Appellant Marilyn Adams ("Adams") was sadly overwhelmed with right hip pain. What was the source? Her hip prosthesis. When was it apparent to her? Unfortunately for her, days before she asserts—indeed, days before her hip revision surgery. As such, she brought this action too late, since she knew of her right hip pain and its connection to the allegedly defective prosthesis before her surgery. Pennsylvania's discovery rule therefore does not save her cause. Because I cannot steer clear of these facts, I cannot join my friends in the Majority. I thus dissent.

## I. BACKGROUND

After Adams began experiencing right hip pain in 2008, she underwent total right hip replacement surgery at the hands of Dr. Prodromos Ververeli ("Dr. Ververeli") on January 18, 2011. During the surgery, Dr. Ververeli replaced Adams's natural right hip with a Zimmer M/L Taper Kinectiv Stem and Neck and Versys Femoral Head (the "Zimmer Device"), a hip prosthesis manufactured by Appellees Zimmer US, Inc.; Zimmer Holdings, Inc.; Zimmer, Inc.; and Zimmer Surgical, Inc. (collectively, "Zimmer"). For some time after the surgery, Adams did well.

But, by September 21, 2012, Adams began experiencing right hip pain again. Over the course of the next three years, Adams met with Dr. Ververeli several times. After pursuing and eliminating several potential causes for the pain, Dr. Ververeli eventually concluded that she was suffering from

1

metallosis—metal wear from the Zimmer Device that was causing an adverse reaction to the surrounding tissue. On January 30, 2015, Dr. Ververeli shared his unequivocal conclusion with Adams. On that same day, Adams decided, based on Dr. Ververeli's recommendation, to undergo hip revision surgery to replace the Zimmer Device with another hip prosthesis manufactured by a different company. On February 9, 2015, Adams signed an informed consent form for the surgery, which indicated that Dr. Ververeli's final diagnosis was indeed metallosis.

Three days later, on February 12, 2015, Dr. Ververeli successfully performed the hip revision surgery on Adams. During the surgery, Dr. Ververeli replaced the Zimmer Device with a ceramic device manufactured by a different manufacturer. The surgery corroborated Dr. Ververeli's final preoperative diagnosis of metallosis, though he uncovered even more corrosion of the Zimmer Device during the surgery than he initially had imagined. Shortly after the surgery, Dr. Ververeli discussed his surgical findings with Adams. A little under two years later, on February 10, 2017, Adams filed the instant product liability action against Zimmer.

## II. PENNSYLVANIA'S DISCOVERY RULE[1]

As the Majority correctly notes, Pennsylvania law proscribes a two-year statute of limitations on the claims before us. *See* 42 Pa. Cons. Stat. § 5524(2). Although the two-year period typically begins to run once an injured party suffers an injury, *see Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005), the discovery rule provides a limited exception, tolling the statute of limitations in certain cases involving latent injury or an inapparent causal connection, *see Wilson v. El-Daief*, 964 A.2d 354, 361 (Pa. 2009).

But, even in such cases, Pennsylvania's discovery rule only tolls the statute of limitations until the injured party has "actual or constructive knowledge of at least some form [(1)] of significant harm and [(2)] of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause." *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011) (quoting *Wilson*, 964 A.2d at 364); *see Debiec v. Cabot Corp.*, 352 F.3d 117, 132 (3d Cir. 2003) (noting that an "unrebutted suspicion" of an injury caused by another is sufficient to trigger the statute of limitations in Pennsylvania). The injured party also need not know "the precise medical cause of her injury," that "her physician was negligent," or that

---

[1] Since this case arises under diversity jurisdiction, we apply Pennsylvania substantive law. Under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), our task is thus to predict how the Supreme Court of Pennsylvania would rule if it were deciding this case. *See Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91–92 (3d Cir. 2008).

"she has a cause of action" for the limitations period to begin. *Wilson*, 964 A.2d at 364 n.10 (citations omitted).

Importantly, Pennsylvania intentionally crafted its discovery rule to be narrow, placing a heavy burden on the injured party invoking the rule. *See id.* at 364 (reviewing the two major "approaches to determining accrual for limitations purposes" in other jurisdictions and formulating its own discovery rule to reflect the "narrower" one); *see also Gleason*, 15 A.3d at 484 ("Pennsylvania's formulation of the discovery rule reflects a narrow approach 'to determining accrual for limitations purposes' and places a greater burden upon Pennsylvania plaintiffs vis-á-vis the discovery rule than most other jurisdictions." (citing *Wilson*, 964 A.2d at 364)).

The injured party thus bears the burden of proof. *Wilson*, 964 A.2d at 362. To toll the statute of limitations, the injured party must demonstrate that, even through the exercise of reasonable diligence, she was unable to determine that she suffered an injury that was causally linked to the conduct of another. *See Cochran v. GAF Corp.*, 666 A.2d 245, 250 (Pa. 1995). Reasonable diligence requires the injured party to exhibit "those qualities of attention, knowledge, intelligence[,] and judgment which society requires of its members for the protection of their own interest and the interest of others." *Fine*, 870 A.2d at 858 (quoting *Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000)).

Indeed, determining when the injured party knew or should have known that she was injured by another party's conduct is a fact-intensive inquiry ordinarily for a jury to decide. *Wilson*, 964 A.2d at 362. But the Supreme Court of Pennsylvania has importantly noted that "courts may resolve the matter at the summary judgment stage where reasonable

4

minds could not differ on the subject." *Id.* (citing *Fine*, 870 A.2d at 858–59, and *Cochran*, 666 A.2d at 248).

## III. THE MAJORITY'S MISSTEPS

Since Adams filed this lawsuit on February 10, 2017, her claims are only timely if they accrued on or after February 10, 2015. In my view, the District Court correctly determined that Adams's claims accrued as a matter of law by January 30, 2015—when Dr. Ververeli informed Adams she was experiencing metallosis from the Zimmer Device.[2] Today, in holding that factual issues bar summary judgment, the Majority errs in three chief respects: (A) it overlooks or undervalues undisputed material facts, (B) it misapplies the appropriate legal standard, and (C) it relies on inapposite cases. I address each error in turn.

### A. Oversight of Undisputed Material Facts

The Majority erroneously concludes that reasonable minds could disagree as to when the statute of limitations began chiefly by overlooking material facts. Most damningly, Adams admitted in her deposition that she knew by January 30, 2015 that her injury was causally linked to the Zimmer Device. When asked about her state of mind on that date when Dr. Ververeli recommended that the Zimmer Device be replaced, Adams responded: "It just seemed that something was wrong. [The Zimmer Device] had to come out. . . . It was a problem." App. 167. Inherent to her concession that she knew then that

---

[2] Indeed, this certainly more than meets the "unrebutted suspicion" standard our jurisprudence reflects. *Debiec*, 352 F.3d at 132.

5

there was a problem with the Zimmer Device that required its removal is the notion that she connected her injury to Zimmer's conduct. That is all the second element of Pennsylvania's narrow discovery rule demands. *See Gleason*, 15 A.3d at 484 (requiring only knowledge of "some form . . . of a factual cause linked to another's conduct, without necessity of notice of the . . . precise cause" (citation omitted)). By her own words, then, Adams confirmed that she satisfied this element, thereby beginning the statute of limitations, on January 30, 2015. On its own, this concession is game, set, and match.

How, then, does the Majority conclude that reasonable minds could disagree about when the statute of limitations began to run? First, the Majority attempts to undermine the dispositive nature of Adams's concession by chopping it up and unreasonably focusing on a mere portion of it in isolation. *See* Maj. Op. 13 & n.5 (curiously omitting any mention of Adams's testimony that she knew on January 30, 2015 that the Zimmer Device itself was a problem).

Then, and more broadly, the Majority harps at length on what are ultimately immaterial facts. For example, the Majority asserts that Adams's testimony that she would have objected had Dr. Ververeli proposed to replace the Zimmer Device with another Zimmer product, *see* App. 167, does not definitively mean she knew that the Zimmer Device caused her injury. *See* Maj. Op. 13–14. But that is beside the point. In light of Adams's concession from moments prior to that testimony, it does not matter whether or why she wanted to replace the Zimmer Device with another manufacturer's product. Indeed, by the time Adams made this comment, she had already admitted that on January 30, 2015 she knew there was a problem with the Zimmer Device that was causing her pain and thus required its removal. That conceded knowledge

6

is more than sufficient for her claims to have accrued on that date. Reasonable minds could not disagree.

The Majority also dwells over whether Dr. Ververeli clearly explained to Adams that his final diagnosis of metallosis indicated some connection between her injury and the Zimmer Device. *See id.* at 15 (stating that knowledge of medical terminology "is not sufficient to impute constructive knowledge" (citation omitted)). But this is both immaterial, considering Adams's concession, and incorrect, since Dr. Ververeli indeed informed Adams that his metallosis diagnosis implicated the Zimmer Device as the cause of her right hip pain. During his deposition, Dr. Ververeli defined "metallosis" as being "metal wear that then causes a reaction to the surrounding tissues." App. 218. He further clarified that, by January 30, 2015, he had not only informed Adams about the metallosis diagnosis, but also explained that this meant she was suffering from "adverse local tissue reaction from wear and fretting to the [Zimmer Device]," which would necessitate "revision [surgery] and chang[ing the Zimmer Device to a prosthesis with a] ceramic head" to "correct the problem." *Id.* at 256–57.[3] By January 30, 2015, then, Adams had actual or

_____

[3] Adams's deposition testimony creates no doubt as to Dr. Ververeli's testimony. When asked whether Dr. Ververeli notified her on January 30, 2015 that she was experiencing metallosis, for example, Adams responded that she "[did not] remember." *Id.* at 166. Lack of memory, however, does not establish a genuine dispute at this summary judgment stage. *Cf. Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005). In any event, Adams's inability to recall some things does not undermine her damning concession discussed previously.

7

constructive knowledge that her right hip pain was a reaction to—and thus being caused, at least in part, by—the presence of the Zimmer Device, thereby triggering the statute of limitations.

Further, whether Adams's prior diagnostic history was "unclear" or "difficult," as the Majority characterizes it, *e.g.*, Maj. Op. 4 (citation omitted), is of no moment. Why? That is because, by January 30, 2015, Dr. Ververeli had meticulously eliminated all other potential diagnoses through various tests, scans, and procedures and given Adams a single, unequivocal diagnosis of metallosis. *See* App. 258. By that point, not only was Dr. Ververeli's diagnosis clear, but it was also correct, as the findings during the surgery further supported.

Finally, that the revision surgery uncovered even more corrosion from the Zimmer Device than initially anticipated is also of no significance because the surgery still only corroborated Dr. Ververeli's preoperative diagnosis that Adams's pain was originating from a reaction to the metal in the Zimmer Device. Indeed, as discussed more fully later, Pennsylvania law explicitly instructs us not to consider in our analysis the extent of Adams's injury, which undoubtedly corresponds to the extent of the metal wear uncovered in her surgery. *See Gleason*, 15 A.3d at 484. In sum, then, Adams's claims accrued by January 30, 2015, by which point even she concedes that she knew that her injury was causally linked to Zimmer's conduct. All reasonable minds properly viewing all of the undisputed, material facts would have to agree.

**B. Misapplication of Legal Standard**

In applying the relevant legal standard, the Majority inappropriately heightens the bar for when the statute of

8

limitations is triggered under Pennsylvania's discovery rule. In doing so, it primarily violates two central principles outlined by the Supreme Court of Pennsylvania: for claims to accrue under the discovery rule, an injured party (1) need only know about some form of significant harm, not the full extent of her injury; and (2) need only know about a causal link between her injury and another's conduct, not misconduct.

1. Some Form of Significant Harm, Not Full Extent of Injury

Much of the Majority's position rests on its claim that Dr. Ververeli did not fully appreciate the Zimmer Device's deterioration until he was in the midst of Adams's surgery. But the Majority's attempt to characterize Dr. Ververeli's preoperative diagnosis and postoperative knowledge as being "fundamentally" different, Maj. Op. 12, cannot save the day.

That is because the surgery simply verified Dr. Ververeli's prior diagnosis. If anything, during the surgery, Dr. Ververeli only discovered corrosion of the Zimmer Device, and resulting adverse reactions in Adams's nearby muscle tissue, beyond that which he was already expecting and had parlayed to Adams. *See* App. 235 (Dr. Ververeli's stating that his surgery revealed "abundant . . . reaction" to the extensive corrosion of the Zimmer Device in Adams's nearby "soft tissue"). That, however, is of no moment in our analysis because the Supreme Court of Pennsylvania instructs us to only consider whether an injured party has notice of "at least some form of significant harm," not "the full extent of the injury." *Gleason*, 15 A.3d at 484 (quoting *Wilson*, 964 A.2d at 364). Here, Adams had such notice before the surgery given Dr. Ververeli's correct preoperative diagnosis.

9

Relatedly, to the extent the Majority asserts that Dr. Ververeli's preoperative diagnosis was somehow incorrect due to the extensive corrosion he uncovered during Adams's surgery, that, too, is irrelevant. That is because Pennsylvania's discovery rule only requires that an injured party know of "some form of . . . factual cause link[ing her injury] to another's conduct," not "the precise medical cause of her injury." *Wilson*, 964 A.2d at 364 & n.10 (citations omitted). At core, whether Dr. Ververeli made new discoveries while conducting Adams's surgery, his preoperative diagnosis of metallosis—metal wear that causes a reaction to the surrounding tissues—still correctly put Adams on notice that her injury was causally connected to the Zimmer Device—the only metal in her right hip. That is all Adams needed to know to satisfy the discovery rule's second element.[4]

Perhaps unintentionally, even the Majority admits that the crux of Dr. Ververeli's new findings during the surgery was merely that the Zimmer Device was corroding even more than previously imagined. *See* Maj. Op. 12 (stating that Dr. Ververeli "began the operation . . . expect[ing that the socket of the Zimmer Device] had worn down . . . but [also] discovered the [Zimmer Device] itself was corroding"). In fact, Adams also concedes this. *See* Appellant's Br. 32 (stating

---

[4] The Majority's obsession with the "debris" Dr. Ververeli found during the revision surgery is likewise misplaced because Dr. Ververeli has clarified that "fretting and metal wear debris . . . are very similar," as they are both "types of corrosion," which he already expected before the surgery. App. 218. By focusing on this, then, the Majority is simply on an intellectual—but ultimately irrelevant—frolic.

10

that, during the surgery, Dr. Ververeli saw "a lot more [tissue] reaction" than he expected (citation omitted)).

Dr. Ververeli's own testimony crystallizes this point. During his deposition, Dr. Ververeli confirmed that, "[p]rior to conducting th[e] revision surgery," his "definitive diagnosis" was that Adams was "suffering from an adverse local tissue reaction to the [Zimmer Device]," which he had previously defined as metallosis. App. 238. When also asked whether, "after [he] performed th[e] revision procedure . . . [he] was able to formulate [the] opinion as to whether . . . Adams was suffering from an adverse local tissue reaction," he answered in the affirmative. *Id.* In other words, the surgery just confirmed what Dr. Ververeli predicted, and expressed to Adams, before the surgery.

In sum, then, the undisputed material facts before us demonstrate that Dr. Ververeli's preoperative diagnosis remained unchanged after Adams's surgery. The only new intraoperative discovery was the extent to which the Zimmer Device corroded and Adams's nearby muscle tissue had thus adversely reacted. Hence, by hanging its hat on developments that merely go to "the full extent of [Adams's] injury," the Majority flouts Pennsylvania law. *Gleason*, 15 A.3d at 484 (quoting *Wilson*, 964 A.2d at 364).

### 2. Causal Link Between Injury and Another's Conduct, Not Misconduct

The Majority also errs in that it inappropriately focuses on whether Adams knew that the Zimmer Device was flawed in some respect. Most strikingly, the Majority's own words indicate that its analysis turns on whether Adams, through Dr. Ververeli, "realize[d] a problem with the [Zimmer Device] was

11

injuring" her. Maj. Op. 13. But that is not what Pennsylvania's discovery rule demands for claims to accrue. Instead, the discovery rule hinges on whether the injured party has knowledge of a causal link between her injury and "another party's conduct," not misconduct—i.e., negligence. *Gleason*, 15 A.3d at 484 (quoting *Wilson*, 964 A.2d at 364). Put differently, the question is not whether Adams was on notice of a problem with the Zimmer Device—i.e., a design defect—but rather whether she was on notice of her problem—her right hip pain—relating to the Zimmer Device. Here, she was.

Even the Majority concedes this articulation of the legal standard. *See* Maj. Op. 11 ("For the statute of limitations to start, [Adams] 'need not know that [the] defendant's conduct is injurious.'" (second alteration in original) (citation omitted)); *see also, e.g.*, *Wilson*, 964 A.2d at 362 ("[T]he fact that a plaintiff is not aware that the defendant's conduct is wrongful, injurious[,] or legally actionable is irrelevant to the discovery rule analysis[.]" (citing *Burton–Lister v. Siegel, Sivitz and Lebed Assoc.*, 798 A.2d 231, 237 (Pa. Super. 2002)). But the Majority nonetheless corrupts the standard in its application.

In particular, the Majority attempts to use the reasonable diligence requirement as a sword that somehow pierces Pennsylvania's binding and timeworn articulation of the discovery rule. As the Majority apparently sees it, that "a factfinder could reasonably determine that Adams had exercised reasonable diligence . . . strongly counsels against determining notice as a matter of law." Maj. Op. 11. The Majority reaches this erroneous conclusion because, in explaining the rationale behind the reasonable diligence requirement, one case once mentioned that the rule that a plaintiff need not know that the defendant's conduct was

12

wrongful "has limited relevance in scenarios in which the plaintiff has exercised diligence but remains unaware of [the injury and causation] factors." Maj. Op. 11 (citation omitted).

But this reasonable diligence discussion is a red herring here. By its plain terms, the language the Majority cites only contemplates a plaintiff's diligence possibly alleviating application of the discovery rule's causation element where, despite her diligence, she remains unaware of the causal link between her injury and the defendant's conduct. Adams, however, had such knowledge here, evidenced chiefly by her admission that she knew by January 30, 2015 that the Zimmer Device "was a problem" and thus "had to come out" of her right hip. App. 167. Thus, that Adams may have investigated her claim with reasonable diligence does not "strongly counsel[] against determining notice as a matter of law," as the Majority erroneously concludes. Maj. Op. 11. Instead, whether Adams was reasonably diligent has no bearing on this particular analysis because, by the time of her surgery, she had satisfied both elements of Pennsylvania's discovery rule, thus triggering the statute of limitations.

## C. Reliance on Inapposite Cases

Finally, the Majority erroneously relies on cases inapplicable here. In asserting that this case must go to a jury, the Majority gloms onto an array of cases also sent to juries— but none of which are analogous to ours. That is because those cases involved (1) multiple or uncertain causes or (2) incorrect diagnoses. By contrast, Dr. Ververeli here had given Adams a single, correct diagnosis for her injury by January 30, 2015.

13

### 1. Multiple or Uncertain Causes

The Majority supports its proclamation that "diagnostic uncertainty usually creates a jury question" by turning to a handful of cases, including *Fine*, *Wilson*, *Gleason*, and *Carlino v. Ethicon, Inc.*, 208 A.3d 92 (Pa. Super. Ct. 2019). Maj. Op. 10. But each of those cases concerned plaintiffs who were given multiple or uncertain causes for their injuries by their medical providers. *See Fine*, 870 A.2d at 861; *Wilson*, 964 A.2d at 365; *Gleason*, 15 A.3d at 487; *Carlino*, 208 A.3d at 106. Although the Majority properly notes that Adams previously had a "difficult diagnostic history," Maj. Op. 14 (internal quotation marks and citation omitted), by the time of Adams's January 30, 2015 office visit, Dr. Ververeli had thoroughly eliminated all of the other potential causes for her injury and given her a single, unequivocal diagnosis of metallosis, *see* App. 258 (Dr. Ververeli's affirming that on "January 30, 2015" he "confirmed that [Adams] was suffering from metallosis"). As a result, *Fine*, *Wilson*, *Gleason*, and *Carlino* are all inapposite.

### 2. Incorrect Diagnoses

Lastly, the Majority's reliance on *Nicolaou v. Martin*, 195 A.3d 880 (Pa. 2018), is misplaced for at least two reasons. First, and most notably, unlike the many incorrect diagnoses the plaintiff in *Nicolaou* had previously received, *id.* at 895, Dr. Ververeli's final preoperative diagnosis of metallosis was correct. Second, prior to receiving the positive test result that verified her malady, the *Nicolaou* plaintiff had only received a "probable"—not final—diagnosis from her medical provider.

14

*Id.* at 884.[5]  Here, in contrast, Dr. Ververeli "confirmed" to Adams on January 30, 2015 "that she was suffering from metallosis."  App. 258.  The correct, final nature of Dr. Ververeli's diagnosis critically distinguishes it from the *Nicolaou* medical provider's "probable" diagnosis. *Nicolaou*, 195 A.3d at 884.  These two features render *Nicolaou* inapplicable to our case.

## IV. CONCLUSION

While our legal system aims to give all their day in court, a plaintiff must comply with the rules.  Here, any sympathies for her properly put aside, Adams did not.  The undisputed material facts indicate that her claims are time-barred by Pennsylvania's applicable statute of limitations.  Even drawing all inferences in Adams's favor, no reasonable mind could conclude otherwise.  I thus dissent.

---

[5] That correct diagnosis only became final when the plaintiff received the positive test result.  Importantly, the Supreme Court of Pennsylvania never questioned that, even under the discovery rule, the *Nicolaou* plaintiff's claims would have accrued at the latest when she received the correct, final diagnosis of her disease.

15