**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2169
_____

PRIME ENERGY AND CHEMICAL LLC,
Appellant

v.

TUCKER ARENSBERG, P.C.; MICHAEL A. SHINER
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2-18-cv-00345)
Magistrate Judge:  Honorable Maureen P. Kelly
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
July 12, 2024

Before: SHWARTZ, PHIPPS, and MONTGOMERY-REEVES, *Circuit Judges*.

(Opinion filed: October 8, 2024)

_____

OPINION*
_____

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

MONTGOMERY-REEVES, *Circuit Judge*.

Prime Energy and Chemical LLC ("Prime") appeals the District Court's order dismissing its fraud-based claims relating to the sale of assets. Because Prime's claims are time-barred, we will affirm the District Court's judgment.

## I.     BACKGROUND

This case concerns hotly disputed conduct surrounding the attempted sale of an oil and gas lease, wells, and related assets in Pennsylvania (the "Swamp Angel Lease" or the "Lease"). MarcellX, LLC ("MarcellX")—which was 50% owned by Mark Thompson and 50% by John, David, and George Prushnok—acquired the Swamp Angel Lease in April 2012. In December 2014, Thompson assigned his shares to the Prushnoks but retained liability for half of a $3 million CNB Bank mortgage loan that MarcellX had taken out for the Lease.

By September 2015, Thompson and his company, Mid-East Oil LLC ("Mid-East"), had engaged Thomas Belton to find buyers for the Swamp Angel Lease. Belton identified Prime's John Acunto and Russell Parker, and negotiations ensued. The parties signed a Letter of Intent (the "LOI") and then executed a Purchase and Sale Agreement (the "PSA"). Prime paid a non-refundable deposit into escrow, and trouble arose between Prime and Thompson, Mid-East, and Thompson's counsel, Michael A. Shiner. A deal eventually closed, but not one involving Thompson and Mid-East.

On March 15, 2018, Prime sued Shiner and Shiner's law firm, Tucker Arensberg, P.C. ("TA"), claiming that Shiner/TA defrauded Prime by (1) facilitating Thompson's misrepresentations that he solely owned MarcellX, which held the Swamp Angel Lease;

(2) directing Prime's payments to Thompson rather than to Shiner/TA's escrow account; and (3) failing to make required disclosures of liens and other encumbrances on the Lease. The District Court dismissed Prime's fraud-based claims as time-barred. Prime appeals.

## II.     DISCUSSION[1]

Prime argues that we should reverse the District Court's order dismissing its claims as time-barred because tolling doctrines save the claims. We disagree.

### A.     Statute of Limitations and Tolling Doctrines for Fraud Claims

Pennsylvania's two-year statute of limitations governs fraud claims. 42 Pa. Cons. Stat. § 5524(7). The two-year statute of limitations starts to run as soon as "the cause of action accrued[.]"[2] *Id.* § 5502(a). Under Pennsylvania law, "lack of knowledge, mistake

---

[1] The District Court had jurisdiction over this case under 28 U.S.C. § 1332(a)(1). We have jurisdiction under 28 U.S.C. §§ 636(c)(3) and 1291. Our review of the District Court's order granting summary judgment is plenary. *United States v. Care Alts.*, 81 F.4th 361, 369 (3d Cir. 2023). The movant bears the burden under Federal Rule of Civil Procedure 56(c) of demonstrating the absence of any genuine issue of material fact for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987) (en banc), *abrogated on other grounds by Seman v. Coplay Cement Co.*, 26 F.3d 428, 438 n.13 (3d Cir. 1994). "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

[2] Prime does not challenge the District Court's finding that its claims accrued no later than December 15, 2015, when the PSA—which Prime previously described as one of the "principal instrumentalities of the fraud"—was executed. *Prime Energy & Chem., LLC v. Tucker Arensberg, P.C.*, 2023 WL 3867205, at *18 (W.D.Pa. June 7, 2023) (quoting Dist. Ct. Dkt. 239 at 5–6). Therefore, absent tolling of the limitations period, Prime had two years from that accrual date to sue Shiner/TA.

or misunderstanding do not toll the running of the statute of limitations." *Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 246 (Pa. 2021) (quoting *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)). But untimely claims may be saved by various doctrines. Two are relevant here: the discovery rule and the fraudulent concealment doctrine.

"[T]he discovery rule, 'tolls the statute of limitations when an injury or its cause is not reasonably knowable.'" *Id.* at 247 (quoting *In re Risperdal Litig.*, 223 A.3d 633, 640 (Pa. 2019)). The discovery rule uses the "inquiry notice" approach, a "stricter and less plaintiff favorable . . . approach [that] 't[ies] commencement of the limitations period to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct.'" *Id.* (second alteration in original) (quoting *Wilson v. El-Daief*, 964 A.2d 354, 364 (Pa. 2009)). This inquiry does not require "notice of the full extent of the injury, the fact of actual negligence, or precise cause." *Id.* (quoting *Wilson*, 964 A.2d at 364). Rather, a fraud claim's two-year limitations period begins to run when a plaintiff is "put on inquiry notice by 'storm warnings' of possible fraud." *LabMD Inc. v. Boback*, 47 F.4th 164, 182 (3d Cir. 2022) (quoting *Beauty Time, Inc. v. VU Skin Sys., Inc.*, 118 F.3d 140, 148 (3d Cir. 1997)). Furthermore, "plaintiff's inability to know of the injury must be 'despite the exercise of reasonable diligence[.]'" *Rice*, 255 A.3d at 247 (alteration in original) (quoting *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005)).

"The fraudulent concealment doctrine is a distinct but related theory." *Id.* It recognizes that "fraud can prevent a plaintiff from even knowing that he or she has been

4

defrauded." *Id.* at 248. "Where, 'through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry,'" the defendant may not invoke the bar of the statute of limitations. *Id.* (quoting *Molineux v. Reed*, 532 A.2d 792, 794 (Pa. 1987)). But "the plaintiff must use reasonable diligence to investigate [its] claims" before it "may invoke the principles of fraudulent concealment," *id.* at 253, and the plaintiff carries the burden of proof by "clear, precise and convincing" evidence, *id.* at 248 (quoting *Molineux*, 532 A.2d at 794).[3]

The same standard of reasonable diligence applies under the discovery rule and the doctrine of fraudulent concealment. *Id.* at 252 (citing *Fine*, 870 A.2d at 860–61). "This 'is not an absolute standard, but is what is expected from a party who has been given reason to inform himself of the facts upon which his right to recovery is premised.'" *Id*. at 247 (quoting *Fine*, 870 A.2d at 858). "When information is available, the failure of a plaintiff to make the proper inquiries is failure to exercise reasonable diligence as a matter of law." *Kingston Coal Co. v. Felton Mining Co.*, 690 A.2d 284, 289 (Pa. Super. Ct. 1997). Reasonable diligence is "generally a question for the jury," *Harry Miller Corp. v. Mancuso Chems. Ltd.*, 469 F. Supp. 2d 303, 313 (E.D. Pa. 2007), but a court can decide the issue as a matter of law where "reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause[.]" *Adams v. Zimmer US, Inc.*, 943 F.3d 159, 164 (3d Cir. 2019)

---

[3] In fact, the *Rice* court noted that "even affirmatively misleading acts do not estop a defendant from invoking the statute of limitations if the [plaintiff] has failed to act with reasonable diligence." *Id.* at 249.

(quoting *Fine*, 870 A.2d at 858–59).

### B.      Undisputed Notice of Fraud

This appeal begins and ends with the reasonable diligence inquiry.  The undisputed facts show that Prime, Thompson (as principal of Mid-East), and Belton (Thompson's middleman) signed the LOI on October 9, 2015.  The next day, Belton requested Shiner/TA's account information for Prime's deposits.  Thompson forwarded this email to Shiner.  Shiner never gave TA's bank account information to Belton or Prime.  But Belton sent Thompson/Mid-East's bank account routing information to Prime, under the mistaken belief that this account belonged to Shiner/TA.  Thompson, acting as the "owner" of MarcellX and "President" of Mid-East, and Prime executed the PSA on December 15, 2015.  App. 983.  Under the PSA, Prime agreed to complete payment of a $600,000 deposit to "Seller's" attorney's (i.e., Shiner/TA's) bank account within five business days of signing the PSA, and Thompson agreed to provide a list of capital and legal expenditures up to that amount already-incurred at closing.  App. 974.

On January 18, 2016, Prime received its first storm warning.  Belton emailed Acunto about Swamp Angel-related expenses, writing: "Here is the list of expenses to date of the draw against the $600K. . . . The $13,004.87 the last number at the bottom of the page is what's left in the escrow account today that has not been spent."  App. 1541.  When Parker saw the January 2016 expense statement, he and Acunto "were very upset to see that the supposed expenditures – none of them – met the requirements of certain categories of 'Capital Expenditures' under the PSA."  *Id*. at 1967.  Acunto thought the expenses were "garbage" and "not any expenses of our's [sic]."  *Id*. at 432.  Parker

6

believed "that the Seller and its agent, Mr. Belton, had just assembled a somewhat random pile of expense receipts to 'paper' that item on the closing list – to be followed soon by a payday right after the closing." *Id*. at 1970. And when Parker "took a closer look at the expense listing that Mr. Belton attached to his January 18, 2016 email, it became clear that these were not appropriate expenses under the 'Capital Expenditures' section of the PSA – and they were not *current* expenses. Most of them appeared to be for non-capital items that had been incurred and expended many months or years before." *Id*. (emphasis in original). In fact, some of "the supposed expenditures were actually for . . . other companies . . . and sometimes not true business expenses at all." *Id*. at 1968. So Prime was on notice as of January 18, 2016, that Thompson had made potentially fraudulent withdrawals of the deposit funds in violation of the PSA. This gave Prime notice of a potential injury and reason to inform itself. [4]

Prime argues that Belton's January 20, 2016 email responding to the January 18 email lulled Prime into inaction. According to Prime, Belton's emails "apparently

---

[4] To the extent Prime suggests in witness affidavits that it did not have notice of potential fraud on January 18, that claim is inconsistent with Parker's earlier deposition testimony as one of Prime's principals that he did understand the deposit funds had been fraudulently misspent. The District Court did not abuse its discretion in disregarding affidavit testimony inconsistent with Parker's deposition testimony under the "sham affidavit" doctrine because plaintiffs offered no explanation for the inconsistency. App. 1007–1008. *See also Prime Energy & Chem., LLC*, 2023 WL 3867205, at *18 (applying sham affidavit doctrine); *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) ("[A] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict."); *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 209 (3d Cir. 2022) (applying an abuse of discretion standard in reviewing trial court's application of the sham affidavit doctrine).

remedied" Prime's concern regarding the unauthorized expenditures because they clarified that the purchase price would be reduced by the $600,000 deposit. Reply Br. 10. Even if that is true, more storm warnings arrived in February and March that should have prompted action.

"[O]n or about February 20, 2016, four months into the Transaction," Prime was told "that there was a mortgage on the property[,]" which was inconsistent with the earlier representations that Thompson owned the Lease "free and clear." App. 1826. "Prime Energy did not know the balance of the mortgage, but [Prime] immediately requested a bank estoppel letter. Neither Thompson, Shiner [nor] TA ever supplied this estoppel information." *Id*. at 1826–27. Then Thompson asked for additional funds. After questioning Thompson/Mid-East about the need for additional funds, "[i]t finally became clear that the Property was at risk of imminent forclosure [sic]." *Id*. at 1827. So in addition to the "$600,000 non-refundable deposit" Prime made "in good faith," Parker and Acunto agreed to "advance another $120,000 to Mid-East. It [wa]s understood that the $120,000 w[ould] be used to pay . . . drilling and labor costs ($40,000) as well as the note to [CNB Bank] ($78,000[])." *Id*. at 1262. "Prime Energy requested a bank receipt for the $78,000 mortgage payment and a letter showing that the bank issue was cured. TA/Shiner never supplied this critical information." *Id*. at 1827.

On March 2, 2016, after Thompson refused to send Belton a copy of a certified check proving that Prime's $78,000 mortgage loan payment had gone to CNB Bank, Acunto told Thompson, Belton, Parker, and Shiner: "Mark I agreed to send the $78798.97. Before you informed you needed 120000. This payment is your obligation

8

not mine and as such I am demanding a copy of the certified check from Mark Shiner's trust account, Now." *Id*. at 1579. Acunto continued: "Don't play games with me. You have been on the receiving end of $678,000 and you have the unmitigated gall to ask for payment for your contractor. I expect a copy of the check in return email[.]" *Id.* That same day, Thompson forwarded an email drafted by Shiner to Parker, Acunto, and Belton clarifying the Prushnoks' membership interest in MarcellX, their 50% share of the bank loan, and Thompson/MarcellX's authority to engage with Prime about the property. Parker responded to Thompson, "Thank you for that clarification. I understand perfectly." *Id*. at 1135–37.

As such, it cannot be disputed that by March 2, 2016, Prime knew: (1) that there were unauthorized withdrawals of its deposit money from the escrow account; (2) that there was a previously undisclosed bank lien on the property; (3) that the bank loan was delinquent; and (4) that Thompson was not the sole owner of MarcellX. Each of these facts is inconsistent with the December 2015 PSA, which contemplated: (1) that Prime's deposit funds were to be used to reimburse specific authorized project expenses; (2) that Thompson would deliver Prime clear title to the Swamp Angel Lease; and (3) that Thompson was the sole owner of MarcellX. Prime's discovery of the delinquent lien on the Swamp Angel Lease, the Prushnoks' ownership of MarcellX, and Thompson's unauthorized expenditures of the escrow funds made clear that Thompson and Shiner/TA were not being forthright about the circumstances of this sale. These were certainly storm warnings of fraud and dishonesty sufficient to trigger an obligation to conduct a reasonable investigation to discover the extent of the fraudulent conduct and the

9

fraudulent actors. *LabMD Inc.*, 47 F.4th at 180 ("LabMD also knew or should have known by 2010 that Tiversa was the source of the injuries flowing from the FTC's investigation and subsequent enforcement action. . . . Even if LabMD did not have actual knowledge that the FTC had gotten its information about the 1718 File from Tiversa, there were enough 'storm warnings' that it should have known that Tiversa was the source."). Thus, the two-year statute of limitations began to run by March 2, 2016, at the latest. And Prime's complaint filed on March 15, 2018, is untimely.

Prime insists "that Messrs. Acunto, Hellwig and [Parker] did not express an awareness of" and "did not discuss as attorney and clients (or in any other capacity), the Shiner/TA frauds in this matter before mid-June 2016." App. 1971. Because of this, Prime argues, its claims were timely filed. It may be true that Prime did not discuss the Shiner/TA frauds before June 2016. But that does not save Prime's claims because Pennsylvania law does not require full knowledge of the fraudulent actions. *Pocono Int'l Raceway, Inc.*, 468 A.2d at 471 ("[L]ack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations."); *Wilson*, 964 A.2d at 364 (noting that the discovery rule "t[ies] commencement of the limitations period to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct"). The injured party just has to know enough to raise a reasonable suspicion that it has been harmed. And Pennsylvania law does not require notice of all the relevant actors. *See, e.g.*, *Wilson*, 964 A.2d at 364 (stating that inquiry notice under the discovery rule does not require "notice of the full extent of the injury, the fact of actual negligence, or precise cause"). The proper focus under Pennsylvania

10

law is when Prime received warnings of fraud sufficient to provide inquiry notice and prompt an investigation. *Rice*, 255 A.3d at 251 ("Because her claims for damages against [defendants] are based on Bodziak's alleged conduct, [Rice] was on inquiry notice regarding other potentially liable actors, including [defendants], as a matter of law."). Both the discovery rule and the fraudulent concealment doctrine apply only so long as there are no storm warnings of fraud. Prime offers no convincing reason why the discovery of the delinquent bank loans, misused funds, and the Prushnoks' ownership of MarcellX did not provide sufficient storm warnings to inspect and discover the fraud and fraudulent parties.

The contemporaneous emails, Prime's deposition testimony, and the Parker and Acunto affidavits show that Prime knew—by January 18, 2016, when it discovered the unauthorized drawdown of Prime's escrow funds, or at the absolute latest, by March 2, when Prime knew of the bank loan, misused funds, and Prushnoks' involvement—that something was wrong. Prime's refusal to investigate until it had definitive proof of Shiner/TA's fraud does not toll the limitations period. Thus, the District Court correctly determined that this action was time-barred.[5]

## III.   CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment.

---

[5] The material submitted under Rule 28(j) of the Federal Rules of Appellate Procedure does not change our analysis.

11